We'll now move to the second argument on the calendar, which is Natural Resources Defense Council versus US EPA. Thank you. Okay, everybody's set. All right, so Mr. Dale, you reserve three minutes for rebuttal, I think? Yes, thank you. Okay, you may proceed. Good morning, Your Honors. Gabriel Daley from NRDC, on behalf of petitioners with me at council table, or Sarah Tallman from NRDC, and Justin Kolber from Vermont. Vermont rests on its briefs, but Mr. Kolber is here to answer questions, if the Court should have any. May it please the Court. For more than a decade, EPA has struggled to identify the remaining sources of mercury in the American economy and environment, where it's manufactured, how it's used, and where it ends up. And repeatedly, in 2006, 2009, and as recently as 2017, the agency has admitted that it lacks the critical quantity data that it needs. And it is acknowledged that without that data, without what it itself has called the core elements of an inventory, it cannot recommend reforms to reduce mercury use. Oh, so they've conceded the case? Is that the idea? I don't think so, Your Honor. Well, see, why don't we talk about the Lautenberg Act and the regs and the various provisions and the various limiting factors that permit the agency to make decisions that are less than optimal from your perspective. You know, they have a duty to avoid duplication. They have a duty not to apply reporting obligations on people who are unlikely to have that information. There's a requirement for mercury-added products that would be intentional. And the agency generally has a duty to reduce costs on the manufacturers and those as to whom they regulate. And I think there's case law. I'm giving you a little speech here because I want you to be able to respond. There's case law to the effect that the fact that the NRDC would love to have the information, the detailed information that may be in IMERC or other ways, is different from getting sufficient information or adequate information in order to make the reports that could lead to a reduction in mercury, which is what this Lautenberg Act was dealing with. And so why isn't the agency's approach perhaps less than optimal from your perspective but nonetheless a reasonable response? We're talking about the three limitations that we're dealing with here. Sure. Thank you, Your Honor. So as to the component exception first, the component exception exceeds the discretion. The discretion that is real under the statute, as you identified, exceeds the discretion granted to the agency. And whether or not it's reasonable, we disagree. The first question is whether the discretion that EPA purports to exercise is discretion that Congress granted to it in the first place. Well, the component exception focuses on, I think we're talking about assembled products, correct, as to which there is a part that is a mercury-added product. An example that seems to be used in the briefs are headlights of cars. Sure. Just one point to clarify, Your Honor. The exception doesn't apply to the car manufacturer. It applies to the car manufacturer and he's accepted. That's right. Importantly, I think, Your Honor, EPA doesn't dispute that the car is a mercury-added product for purposes of the statute. EPA determined that it wouldn't require reporting from the importer or the manufacturer of the car. But it doesn't dispute that under the terms of the statute, both the lamp and the car are mercury-added products. What does the concept of intentionally mean, then, in the regs and in the statute? Does it mean, is it different from, is every mercury-added product intentionally, does it have an intentional component to it? It does, Your Honor. We think that's clear from the statute. It's not a mens rea kind of thing. No, we don't think a mens rea requirement either makes any sense in context or... Does EPA agree with you on that? We understand their interpretation of intentional to mean something like knowing, and we think that that is inconsistent with the text of the statute and makes little sense in context. How can they report if they don't know? Respectfully, Your Honor... I'm importing whatever from somewhere, toys from China. I have no idea that there's any mercury in the battery that's in the toy. How am I supposed to comply with the rule if I don't know that there is any mercury involved? So, two responses, Your Honor. First is, the record reflects that importers do know, and we know that because state laws... If they do know, they do know. But if they don't know, what are they supposed to do about it? I mean, no toy in America has mercury in it. But the ones from China, it turns out, do. But nobody knows that. Cars may be one thing because it's common knowledge that the headlights often have mercury switches. But what about if you just buy something from abroad that you're interested in selling in the United States and it happens to have mercury in it? I mean, doesn't there have to be some kind of, as a practical matter, knowing requirement? So, two responses, Your Honor. The first is that the state laws that require labeling and reporting of mercuriotic products distinguish the same way around the word intentionally as we think Congress did here, which is not imposing a knowing requirement. And there's no support in the record for the proposition that that is a problem. Is there any indication that any state or anyone has ever penalized somebody for not reporting mercury in a product that they did not know existed? I don't know the answer to that, Your Honor. Well, then how can you say there's no problem, it's never happened, this isn't real? No one knows that. That's kind of the problem, in fact, with some of these regulations is we don't know what's in the product coming from abroad. That's right, Your Honor. But the purpose of this statute, the purpose of creating this inventory, is to learn about what's coming from abroad. I just don't understand why you have to take that on. If it is the case that a company in the United States importing a car from Germany who has every reason to know that cars from Germany, like other cars, have mercury in their headlights, why isn't that intentionally importing a mercury-added product? Why isn't that all you've got to say? Why are you taking on this thing that somebody has to be liable for unintentional importation of things that they don't know are reportable? We don't mean to be pressing some sort of implausible reading. The interpretation that we press is that the manufacturer of a mercury-added product is intentional. I would think so, at least if they do know that the product contains mercury. Absolutely, and the record reflects that importers do know. You're saying that anybody has a duty to investigate, to find out information that they don't already know. That would be an impossible burden that the companies would have to build a bureaucracy into investigating every product that they import to see whether it has mercury or not. Respectfully, Your Honor, I'm not sure what the burden of that would be, but we're not arguing that EPA was required to impose that burden. With respect to the domestic manufacturer, what I'm having trouble understanding in your position, if the maker of the headlight is required to report that they use mercury, that they put them in car headlights, and that they sell the headlights to General Motors, why is it not duplicative? At least why is it not a reasonable judgment for the EPA to make that we now know where this mercury is? It's in the headlights at General Motors, and why isn't it duplicative of them, wouldn't it be duplicative of them to require General Motors to separately report, we use headlights from the headlight company that's already reported the mercury? The precision that Your Honor reads into the regs, I think respectfully, is not quite there. The manufacturer of the lamp will report the NAX code of the recipient of that lamp, which they're in the Federal Registered Preamble, but they're not at the level of GM. They're at the level of automaker or plastics manufacturer. Okay, but so what? I mean, why is it additionally helpful for General Motors to report that it has used headlights with mercury in them from a domestic source? If the domestic sources are required, or for that matter, aren't they also required to report if they bought headlights from Germany that have mercury in them, they're supposed to report that, right? Yes, if they import a mercury out of product, they have to report that. So the only situation in which the car manufacturer is exempt is if it is using headlights with mercury from a domestic source, and the domestic source that manufactured them is also required to report the mercury. That's right, Your Honor. So what is unreasonable about the EPA deciding that in that context, it would be duplicative and potentially even confusing to make a total inventory to then have to get two different reports about the same headlight, one from the domestic manufacturer and one from General Motors, and then they have to figure out, and this may not be a terrible problem, I'm not saying it makes it impracticable, but why isn't it up to them to decide we're better off just getting a report from the component manufacturer, from the component importer, and from anybody who's making something where they're putting the mercury in themselves, why do they need to get two reports about the mercury in the headlight that comes from Dayton Headlight Co., and then a separate report when it's put into a General Motors car? Because an inventory of mercury supply and use requires the agency to identify both where the mercury begins and where it ends up, and to propose reforms I already know where it ends up. The Dayton Headlight Company is reporting it goes to automakers. But to which ones? Who cares? Well, because we don't know the quantities that are ending up. The headlights might It's the same headlight. It's the same product. So that's enough, isn't it? I mean, to get it from the manufacturer of the headlight, we're using this example, mercury-added product, which is the headlight, not the manufacturer who also has the headlight, the same headlight that was sold to the manufacturer. So for the agency to propose reforms to law and regulation to reduce mercury use, the agency is going to need to consider bans on particular products, labeling requirements, alternatives that are perhaps more cost-effective. And to do that, it has to understand where these products, where these components are going to be used. Because they're going to have a separate rule for General Motors than for Ford? If they know that it's going to domestic automakers from domestic manufacturers, what exactly is the regulation that they're going to not be able to propose because they don't know from General Motors that it's the one that bought the headlights from Dayton Headlight Co.? Fair enough, Your Honor. I think as to domestically manufactured headlamps ending up in domestically manufactured cars, they may be able to glean sufficient information. So that's one of your three things that you're challenging. So you're not challenging that one anymore? I mean, I think your best shot is with the imported complete product because I'm going to be asking them, how the heck do you have any idea what mercury is in German cars if you don't require something about that? But that's a different one. The one we've been talking about is one of the three things that you either are or aren't challenging. We are challenging, Your Honor. So then you're not really telling me, okay, Your Honor, I guess I see your point. It's okay for them to not do that. You still must have some reason why you think that's an unreasonable regulation. The headlamps might be a particularly easily traceable example because they're ending up in one sort of use case. But there are other products like mercury switches and relays or batteries or things that are— People who make those products know who they sell to, and can't that be part of the reporting? They know to whom they sell, but they don't report that, Your Honor. They report only the NAAQS code, the industrial moniker for the industry that they're reporting to. And that's insufficient for the purposes of the EPA in terms of making its judgment as to what the amount of mercury is that's necessary to make the reduction calculations and to make the recommendations? It is, Your Honor. We know that because the information like the NAAQS codes, the NAAQS codes themselves was available to EPA at the time of the 2017 inventory, and the 2017 inventory attempted to identify which products mercury components were ending up in. Does the EPA have to have complete information on every use, trade, or whatever the other term is of mercury, or can they make a reasonable estimate on what the amount of mercury is or would be? Two responses, Your Honor. I see them over time. Two responses to every question. The first is that the statute by calling for an inventory of supplies and trade, we don't think allows for that sort of guesstimation. But the second is that the ways in which EPA proposes that it will be able to guess are just not plausible. So the first is this NAAQS code that we've been talking about. The second is relying on data from IMERC, and that data is critically incomplete. In one very important way, which is that IMERC requires reporting only on products that are sold in IMERC states, and IMERC states ban the sale of a big category of very important mercury-added products, and that switches and relays. So as the 2017 inventory reflects, the 2010 is the last year. Is there a way of taking the IMERC reporting and expanding it to a nationwide concept, doing it nationwide? I mean, IMERC is what, 16 states or something of that sort? Yeah, there are 13 states where members can require reporting. They have grown over the last two decades, but there's no suggestion that they're going to become a nationwide consortium. I'm wondering to the extent to which you can do calculations and predictions and estimations that are reasonable without having to gather every detail of the information you would like, and whether that's permitted under the statute. We think in context it makes a little sense that Congress would have directed manufacturers and reporters to report this information to EPA because EPA has attempted to rely on the IMERC data before. So it makes little sense that Congress would have required this reporting when it really meant actually just continue to rely on IMERC, because the IMERC data has proven inadequate for a national inventory. All right, I think we're way over. You've reserved three minutes, but let's hear from the EPA now. Coughlin? Am I saying that right? You are. Coughlin or Coughlin? Coughlin. Good morning, Your Honors. May it please the Court, my name is Andrew Coughlin, and I represent Respondent United States Environmental Protection Agency. With me here at counsel's table today is Aaron Cook from EPA's Office of General Counsel. I think there are two key questions in this case. The first question, of course, is from whom must EPA collect information under its Mercury Inventory Reporting Rule? And the second question, I think, is what information is EPA required to report through its mercury inventory? Now, the answer to the first question is going to be the product of the answer to the second question, because Congress has told us that the purpose of the Mercury Inventory Reporting Rule is to assist EPA in the creation of its mercury inventory. So it's that latter question, the question of what information EPA is required to include in its mercury inventory, that I'd like to turn now. Okay. Could I ask you to address only one of these exemptions, and that is the exemption for a person engaged only in the import of a product that contains a component that is a mercury-added product. So I take it that would apply to a company that's importing German cars that have mercury in the switches and the headlights, or importing toys or watches, Swiss watches that have a battery already in there that has mercury. That's correct, Your Honor. And I'm assuming only that a regulation could only have practical bite on a company that knows that the products that they're importing have mercury in them. Okay. Could you explain to me how EPA would have any idea how much mercury is coming into the country in that situation, given this exemption? Is there any way that that mercury is being picked up by some other aspect of your regulations? Your Honor, I'm going to answer your question directly first, and then I want to address what I think is an implicit premise in your question. So the direct answer to your question, as was alluded to in the earlier argument, is that the IMERC database is a good source of information on that quantity of mercury that might be included in assembled, imported products. And I think a key point to make here is that the IMERC reporting requirements, while they are applicable in 10 states, require entities that sell assembled, imported, mercury-added products. But you're duplicating the IMERC data all over the place. Every other regulation that you've got that's requiring data, you could make the same argument, right? That you could just extrapolate from the IMERC data. So really you don't have to have any of these regulations. Your Honor, I think that brings me to the implicit premise of your question, which is that the inventory is somehow incomplete if it doesn't contain the information about quantities of mercury in that imported German car. And I want to disagree with that premise because I think it's important to be precise about the inventory that Congress called for. What Congress called for was an inventory of mercury supply, use, and trade. And petitioners say that inventory is incomplete if it doesn't account for the mercury contained in products. But Congress didn't ask for an inventory of mercury generally, and it didn't ask for an inventory of mercury in products. What it asked for was an inventory of elemental mercury and mercury compounds. Now, elemental mercury and mercury compounds are commodity raw materials that are bought, sold, and used differently in mercury-added products. In other words, there's a distinction between mercury as raw material and mercury contained in products. And that's a distinction that Congress has long recognized. For example, in 2008... Why do you require reporting on mercury in any products at all? I don't understand. You are requiring everybody who uses mercury in the United States to report it, right? Who uses elemental mercury and mercury compounds, correct. Right. And including... Okay, so that's anyone. Including people who are purchasing products abroad that are components that they are then installing. They're not importing elemental mercury. They're importing a headlight from Germany and putting it in their car. They're required to report that. Correct, Your Honor. Why? Well, the reason is because Congress didn't just ask for an inventory of elemental mercury and mercury compounds. It also told EPA to identify any products that intentionally add mercury. And the way that EPA interprets that is identify any products where mercury, meaning elemental mercury and mercury compounds, have been intentionally added. So the battery, for example, that's manufactured elsewhere, is a product to which somebody has inserted elemental mercury compounds. Exactly. You limit it just to that as opposed to the assembled product of which the battery is a part? Yes, Your Honor, we do. And we think that follows from the plain text of the statute. I'm sorry. I'm having a lot of trouble with the plain text of the statute. If I import, if I make watches in the United States, right, made in USA, but I get the batteries that I put into the watch from Switzerland and those batteries have mercury in them, and I'm required to report that I have imported batteries from Switzerland. If I instead am an importer of Swiss watches, and I know perfectly well that every one of those watches has a mercury-added battery in it, why don't I have to report? What is it that Congress doesn't want to know about that way of bringing a mercury-added product into the United States? The distinction, Your Honor, follows from the requirement that Congress imposed on EPA, which was to identify products where elemental mercury and mercury compounds have been intentionally added. They deliberately decided that there would be mercury coming into the country that they wouldn't know anything about and didn't want to know anything about. Well, the product there, the watch in your example, the Swiss watch in your example, is not a product to which mercury, elemental mercury and mercury compounds... Sure it is. It's added indirectly, but it's added to the watch. You could have a watch without mercury in it. Instead, you have a watch that has mercury in it. It happens to be in the battery. Let me illustrate the point with an example, Your Honor. Take root beer. Root beer is a product that's made by adding water to syrup. I hope there's no mercury in it. Me too. If I take root beer and I add it to a mug of vanilla ice cream, I have intentionally added root beer to that vanilla ice cream. No one would say that I'd intentionally added water to that vanilla ice cream. And the reason is because when we talk about combining two products, we tend not to think about combining all of the constituent parts intentionally of one product. Well, that makes sense if, for example, we're trying to decide whether the root beer is properly labeled or something like that. But if we're trying to find out what happens to mercury in the country, that's a very different situation. That's got nothing to do with root beer. This has to do with the fact that Congress wants to know how is mercury flowing through the country. Isn't that what they're interested in? They are interested in that. Now, with the watches and the headlights, we already know something about these are common uses of mercury in part because domestic manufacturers do the same thing. Suppose there is mercury in some kind of product coming from China. No one would ever think that there was mercury in that product because the way we do it here, there's no mercury. But once an importer learns that there's mercury in the products that he's getting from China, the EPA doesn't want to know about that. The EPA doesn't care that there could be a lot of Chinese whatever, drywall, that for some bizarre reason has mercury in it because it was made from the bones of executed Chinese prisoners who ate mercury-contaminated fish or whatever. There's mercury in it. Nobody has any idea that there's mercury in anything like that except the importer, but we don't care. And again, I'm not worried about the importer who doesn't know there's mercury because I don't see how whatever your regulations are, you can capture something that the importer doesn't know. But if the importer is aware that he's buying this that has mercury in it, he has to report it. But if he knows that he's buying this into which this has been installed, we don't care? Not that we don't care, Your Honor. It's that what Congress has asked for is an inventory of elemental mercury and mercury compounds. Are you saying you would be forbidden to, that the act of Congress does not authorize you to require this, that the plain language of the statute would be such that if you did have a regulation that did not have the exemption 713.7 parens B parens 2, that would be in violation of the statute? We are not arguing that, Your Honor. No, you're not arguing that. Because you have discretion to make a judgment about this. That is correct. And you made a judgment about what exactly? You made a judgment that Congress doesn't want to know? The judgment that EPA made reflected in the provision you're referring to, is that the best way to identify products to which mercury has been intentionally added is to require reporting from those who intentionally add products to mercury or to require those who import, in the first instance, a product to which mercury has intentionally been added. That is the policy judgment reflected in EPA's rule. But I'm still trying to understand. You are saying it doesn't matter to your goals or to Congress's goals that the mercury was added to the battery in Switzerland. As long as I'm importing the battery directly, then I have to report that I've imported batteries with mercury in them. If I import batteries with mercury in them that happen to already be installed in a watch, what is it that I'm missing about why that is irrelevant to your goals? The reason, Your Honor, is because, again, Congress has asked EPA to identify products to which mercury has been added. They don't want a complete inventory. They're comfortable with something less than that. Well, I would say that we're not claiming that Congress is content with something less than the complete inventory of elemental mercury and mercury compounds. I'm talking about mercury that is in the country that's either manufactured or imported, leaving aside the fact that it's elemental or a compound. Our claim, Your Honor, is that is not the inventory that Congress has added. Well, let's talk about the language of the statute, because it's not about sort of the hunt for mercury. It's carrying out a statute, right? So the statute directs the EPA to identify any manufacturing processes or products that intentionally add mercury, right? Right. And then it also says to assist in the preparation of a mercury inventory, any person who manufactures mercury or mercury-added products or otherwise intentionally uses mercury in a manufacturing process shall make reports, right? In part, Your Honor, there's the end to that statutory provision is shall report to EPA such information at such time that EPA sets forth by paraphrasing. That's the statute. Yes, correct. Okay. And so you're taking the position that manufacturing processes and products that intentionally add mercury don't include the watch that Judge Lynch is talking about. That is correct, Your Honor. And that if Congress wanted a broader search for mercury, they would have said it or they could say it in another statute. Absolutely, Your Honor. But don't you interpret manufacturers to include imports? Isn't that part of your definition of manufacturers? Well, that is part of TSCA's definition as set forth by Congress, correct. Right.  Yes, I think it is. So the language that Judge Sullivan just quoted to you is that there's a requirement of reporting by any person who manufactures, meaning imports, any person who imports mercury or mercury-added products. Well, I think what that statutory provision says in plain language is that anyone who fits the description that you've just mentioned, Your Honor, is required to report to EPA when EPA asks for information. Exactly, exactly. When EPA asks somebody who fits that description. Right. But you're not contending that someone who imports the watch that I referred to is not a person who manufactures, which means imports, mercury-added products. Correct, Your Honor. We are not making that claim. That is someone who does that. And you're just saying you are authorized to make your own judgment about what information that person should report, and your judgment is they should report nothing. In the case of my watch importer. Well, yes, Your Honor, but I would phrase it slightly differently. I'm sure you would, because that doesn't sound very good, does it? Our argument is that EPA is authorized to make decisions about which mercury-added product manufacturers import so long as it meets the requirements that Congress set forth in the statute. Again, because... I get it. Under the normal discretion that an agency has in implementing this regulation, you can make reasonable judgments, right? And what I'm still trying to get at is it does not sound to me as if you, any more than they, have pointed to some language in the statute that dictates an answer that you must require reporting of this or you're not allowed to require reporting of that. We're asking about whether you've made a reasonable judgment, and I'm still trying to hear, not with reference to some bogus argument about what the statute does or doesn't say, because you've just conceded that one away. You've just conceded that the statute would allow you to regulate this watch manufacturer, and indeed that the statute says that that watch manufacturer has to report. Whatever information you think is reasonable, I'm trying to understand what is reasonable about exempting the person who imports the watch with the mercury in it while still requiring a report from the person who imports the battery itself. I think the line that petitioners would have us draw is just require everybody who imports... They're asking for a whole lot of stuff that I'm not interested in. I'm focused on this particular exemption and what makes it rational. That's all I want to know. Tell me what makes that a rational choice to make. So the concern that underlies the distinction that EPA drew between the watch importer and the battery importer is this. There are, I would wager, within a one-mile radius of this courthouse, probably dozens if not hundreds of small entities that import assembled products that contain some component that contains mercury in it. EPA did not want to draw a reporting rule that's going to ensnare all of those entities within the scope of the rule because that would be thousands, tens of thousands, hundreds of thousands, who knows how many but a lot of entities that would have information that is not essential to EPA to do what Congress asked it to do, to produce the inventory that Congress asked it to do. So it's a cost judgment not only in terms of the costs on small importers but also in terms of the costs of collating and understanding all of these reports that would come in otherwise. Yes, and? And that's why I missed that in your brief. That's an argument that's made in the brief that that's the basis for the judgment and that there's a basis in the administrative record for saying if we require all of these importers of products that use mercury-added products, that's just going to get out of hand. We just can't handle the volume and it would be too much cost on small importers. Is that an argument that you can refer me to in your brief, which will tell me where in the administrative record there is information about that? Because I didn't get that. That was your point. Your Honor, I don't know the precise pages in our brief to refer you to. I can look at that. But you're telling me it's in there somewhere and I can find it if I reread the brief. Yes, and I will say that the discussion in the administrative record that's germane here, there are a couple of points, but one thing I want to note specifically is that the penalties for noncompliance with this rule are quite high. And so along with a $37,500-a-day penalty for noncompliance, there is a burden on EPA as a matter of good government to make sure that everyone who's subject to this rule is on notice of exactly what they have to produce. And there's a discussion in the administrative record about the outreach that's going to be necessary already. EPA talked about how it was trying to figure out how it was going to get the word out, and that task becomes exponentially harder if you draw the lines to include the importer of the watch in the scope of this rule. Okay, but that's what I should be focused on in trying to figure out whether this is a reasonable choice. Correct. I understand. I understand. That position I understand. Okay. All right. Well, you've got six extra minutes. You're lucky. We'll now hear from Mr. Daley for three minutes or who knows how long. Thank you. Thank you. I'd like to focus on a couple points about these importers. The first is the explanation EPA now gives for the concern for mom-and-pop shops doesn't have a basis in the record, Your Honors. Everyone within a few-block radius of this courthouse is subject to reporting laws from the State of New York, and they report to IMERC. The IMERC database reflects no more than triple-digit reporters in the whole country, 600 or so. So the specter of thousands of mom-and-pops being subject to reporting requirements just does not compute. There is no basis for that in the record. The premise of EPA's- What you're saying is that the record at page three, at page A24, which deals with the explanation on persons who manufacture or import mercury-added products doesn't reference that argument, that point. It's a rather lengthy explanation, but there are several pages, right? That's right, Your Honor. I mean, that's where we looked for the explanation. That's right. The point I was making is that that explanation is not only not given by EPA in its preamble, but it also lacks any basis in the remainder of the administrative record on which EPA relied in giving its justification. There is just no record to support the premise that there are these thousands of small importers who might be subject to the reporting requirement. The explanation EPA did give for limiting reporting to intentionally is the one you heard from counsel here, which is that the statute is best read to mean that. But as Judge Lynch noted, EPA has walked away from that justification now and now says that it is resting on the explanation that is too burdensome or that it just doesn't need this information. I think they're saying they don't need it because there is a recording required for import of mercury-added products that can be used as components in the assembled products. That's right, Your Honor. And that's sufficient for them to have an adequate basis for their ultimate inventory and reports. That's right. That's the explanation given in the preamble. What's wrong with that explanation? Because the imported components don't tell us anything about the Swiss watch imported as a whole that is imported with the battery already inside it. The EPA just will have no basis for identifying the Swiss watch. We would have no way of knowing if there are very few batteries imported because I'm just making stuff up here hypothetically. Most batteries are made in the United States, so we don't import a lot of batteries. If that were true, and yet we import lots of watches from Switzerland or lots of whatevers, if they don't capture that, we actually have no way of knowing whether there's a lot or a little of mercury in certain kinds of products. That's right, Your Honor. And we don't actually have to make it up. The record reflects that domestic manufacturers have agreed not to use mercury batteries in their products, but foreign manufacturers who are going to be exporting those products to the United States have not reached any such agreement. So the domestic watch manufactured in the USA is not going to have a mercury battery. For instance, the language that the agency gives, that the agency can use NAICS codes reported for domestic manufactured assembled products to better understand the specific types of imported assembled products that may contain mercury, is nonsense?  As to imported products, the fact that certain components end up in domestic products and conversely, domestic products don't reflect that components are ending up in there, serves as no proxy for what is or is not imported products. How exact do they have to be? They say it can enhance the understanding of mercury supply, use, and trade without necessarily being precise about it. And aren't reasonable estimates also permitted? They might be, Your Honor. We think the better reading of the statute is that an inventory requires an accounting, not estimates. But the real-world evidence of that is that the 2017 inventory, which relied on just those sorts of estimates, lacked any sort of useful information. And EPA was unable to make the recommendations to reduce mercury use based on that inventory. I think the answer is going to be we can't make a reasonable estimate if we have no idea what is in foreign products. And maybe importers know what they're importing that has mercury in it, but even if they do know, we're never going to find out, and we have no way of knowing whether this is a big problem or a little problem or no problem if we don't capture some information about what is included in products that are imported whole into the United States. That's correct, Your Honor. All right. Thank you. We'll leave it there. We'll reserve decision. Thanks very much. Mr. Brown, I think you had a question about what the state is doing to importment. The answer is yes. The state is treating that as an offering. It's like an example of state important deal that are from IMO and from China. Okay. Thanks. You got the last word.